**IN THE UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Denise Marconi, | CASE NO. 1:13-cv-02531-GBC |
| Plaintiff, | (MAGISTRATE JUDGE COHN) |
| v. | MEMORANDUM |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | Docs. 1, 6, 7, 10, 11 |

## MEMORANDUM

### I.      Procedural Background

On August 17, 2010, Denise Marconi ("Plaintiff") protectively filed an application as a claimant for disability insurance benefits, with an alleged disability onset of July 23, 2010.  (Administrative Transcript, hereinafter, "Tr." at 12, 142-43).  After Plaintiff's claim was denied at the initial level of administrative review, at Plaintiff's request, on December 5, 2011, an administrative law judge ("ALJ") held a hearing at which Plaintiff, who was represented by an attorney, and a vocational expert ("VE") appeared and testified.  (Tr. 24-78).  On January 23,

2012, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 12-23).   On March 26, 2012, Plaintiff filed a request for review with the Appeals Council (Tr. 6-8), which the Appeals Council denied on August 9, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-5).

On October 8, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits.  Doc. 1.  On December 18, 2013, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  Doc. 6, 7.  On February 20, 2014, Plaintiff filed a brief in support of the appeal ("Pl. Brief").  Doc. 10.  On March 26, 2014, Defendant filed a brief in response ("Def. Brief").  Doc. 11.  On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge.

## II. Relevant Facts in the Record

Plaintiff was born on October 7, 1968, and thus was classified by the regulations as a younger person through the date of the ALJ decision on January 23, 2012.  (Tr. 22); 20 C.F.R. § 404.1563(c).  Plaintiff completed the ninth grade

and obtained a GED in May 1999.[1]   (Tr. 161).   At the time relevant to the proceedings, Plaintiff was married and lived with her husband and minor child. (Tr. 30).

## A. Relevant Treatment History and Medical Opinions

## 1. Hospitalizations and inpatient treatment

On July 30, 2010, Plaintiff sought in-patient psychiatric treatment at Community Medical Center ("CMC") that lasted until August 9, 2010.   (Tr. 18, 304, 309).   Plaintiff had "thoughts of her killing herself and her son, but she [said] they were just thoughts; she would not do it."   (Tr. 18, 310-11).   Plaintiff said her son's behavior caused her increased stress.   (Tr. 18, 312).   Plaintiff stated that she had more than twenty prior psychiatric hospitalizations.   (Tr. 18, 310).   She also reported that "[s]he just quit one week ago being a janitor" (Tr. 18, 310).   At admission, Plaintiff was cooperative, accessible and she maintained spontaneous and coherent conversation.   (Tr. 298).   Plaintiff's speech was normal, and she showed no evidence of loosening associations, hallucinations, or delusions.   (Tr.

---

[1] There are conflicting statements in the record as to whether Plaintiff took special education classes. *Compare* (Tr. 161) *with* (Tr. 48, 200).

19, 298).   Plaintiff had an inappropriate affect because "she smiled very easily."

(Tr. 298).   She expressed suicidal and homicidal ideation while displaying fair

judgment and partial insight.   (Tr. 298-99).   Plaintiff was oriented and had

adequate memory.   (Tr. 299).   Doctors assigned her a Global Assessment of

Functioning ("GAF") score of 30.[2]  (Tr. 310).

In the discharge report dated August 9, 2010, doctors described Plaintiff as

being "in an improved state with no homicidal or suicidal ideation."   (Tr. 309).

---

[2] See *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). . . . The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. . . . A GAF score of 21–30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. *Id.*").

Plaintiff had shown "gradual, but continued improvement." (Tr. 309). Plaintiff's GAF score improved to 65. (Tr. 18, 309).

## 2. Scranton Counseling Center (SCC)

Throughout the progress notes with SCC, Plaintiff reported fluctuating progress and exacerbation of anxiety and depression while generally: denying any suicidal or homicidal ideation and demonstrating an affect, concentration, attention, and mental status that were unremarkable. (Tr. 384-411). On August 16, 2010, Plaintiff reported some improvement in her symptoms. (Tr. 18, 341). She had an anxious mood, but was alert, friendly, and cooperative with appropriate affect. (Tr. 341). Plaintiff appeared oriented and had non-psychotic thoughts. (Tr. 341). She denied suicidal or homicidal ideation. (Tr. 341). September 20, 2010, the SCC staff[3] assigned Plaintiff a GAF score of 60. (Tr. 411). On October 13, Plaintiff reported "doing well on meds." (Tr. 409). Plaintiff acknowledged some "bad" thoughts, but said she would not act on them. (Tr. 409). She appeared calm and pleasant. (Tr. 409).

---

[3] The signatures are illegible on the "physician signature line" throughout the SCC progress notes.

On November 1, 2010, Plaintiff complained of "intense" anxiety and described that it felt like "having a heart attack." (Tr. 407). Otherwise, the staff physician indicated that Plaintiff maintained an appropriate affect and "ok" concentration and attention, made check marks indicating that Plaintiff had a non-psychotic mental status, and no suicidal or homicidal thoughts. (Tr. 407). On November 8, 2010, Plaintiff reported that she was falling into a depressive state. (Tr. 406). On December 27, 2010, Plaintiff reported feeling "good" and complained of being tired and sleeping from four in the afternoon until three in the morning. (Tr. 404). The report indicated that Plaintiff had an alert, cooperative mood, an appropriate affect, and her concentration and attention remained okay, and otherwise unremarkable. (Tr. 404).

On February 9, 2011, Plaintiff felt more depressed and reported that her husband has to remind her to bathe. (Tr. 403). On February 15, 2011, she reported a stable mood and with a good response to medication. (Tr. 401). The report indicated that Plaintiff's concentration and attention remained okay. (Tr. 401). On February 23, 2011, Plaintiff reported that her mood would not change until her son's behavior changed and also reported that her son had not physically attacked

her in a month.  (Tr. 400).  On February 24, 2011, Plaintiff complained of increased anxiety and situational stress.  (Tr. 398).

On April 5, 2011, Plaintiff reported that she wanted to isolate herself.  (Tr. 397).  Plaintiff again reported anxiety and situational stress.  (Tr. 395).  Her mood remained "fairly stable."  (Tr. 395).  On April 19, Plaintiff reported that she still prefers being by herself and that her son had been attacking her again.  (Tr. 394).  Plaintiff also reported that she was able to take a shower on her own initiative and dine out twice with her husband.  (Tr. 394).  On May 12, 2011, Plaintiff was in tears due to continued issues with her son.  (Tr. 393).  Plaintiff reported that she was "getting out more." (Tr. 393).  The stated goal was for her to continue grocery shopping and couponing.  (Tr. 393).  It was also noted that she started going shopping with a friend.  (Tr. 393).

Two months later, on July 5, 2011, Plaintiff reported experiencing some episodic depression, but was feeling okay overall.  (Tr. 391).  Her GAF score was 68.  (Tr. 392).  On July 7, 2011, Plaintiff reported continued depressive symptoms with decreased motivation, but characterized her mood swings as stable.  (Tr. 390).

She continued to get out more and grocery shopped to relax. (Tr. 390). Plaintiff also reported that her son was doing better. (Tr. 390).

On August 30, 2011, Plaintiff reported continued depressive symptoms and that her son had recently been diagnosed with autism. (Tr. 389). On September 20, 2011, despite anxiety and mood swings, Plaintiff reported feeling "good." (Tr. 410). On September 27, 2011, Plaintiff reported some depression and mild mood swings. (Tr. 387). The staff assigned her a GAF score of 68. (Tr. 388).

### 3.  Antoinette Hamidian, Psy.D. CCC-SLP, Treating Psychologist

On September 10, 2010, Dr. Hamidian completed a Medical Source Statement-Mental. (Tr. 347-49). Dr. Hamidian opined that Plaintiff had many marked or extreme limitations in her abilities to understand, remember, and carry out instructions; and to respond appropriately to supervisors, co-workers, and work pressures. (Tr. 347). Dr. Hamidian held that the Plaintiff was at great risk of self-harm and neglect of family because her medication was unregulated. (Tr. 347). Dr. Hamidian further noted that the Plaintiff suffered from paranoid ideation, increases in aggression when agitated, rapid cycling mood swings, with an inability to work due to repeated mental decompensation. (Tr. 347). Dr. Hamidian noted

that the Plaintiff left her last job and wandered aimlessly around town for hours. (Tr. 347).  Dr. Hamidian wrote that Plaintiff seemingly "disassociates + becomes another personality."  (Tr. 349).   On February 20, 2011, Dr. Hamidian opined that Plaintiff was permanently disabled.  (Tr. 423-24).

On November 29, 2011, Dr. Hamidian completed a Psychological Evaluation.  (Tr. 420-22).  She noted that Plaintiff's current medications helped reduce her paranoid thinking, increased her clarity of thought, and kept her out of the hospital.  (Tr. 421).  Dr. Hamidian noted that Plaintiff's husband brought her to the evaluation, Plaintiff was cooperative with a calm mood, and she had good hygiene.  (Tr. 421).  Plaintiff "graduated in 1992 with regular education."  (Tr. 421).  Dr. Hamidian noted that Plaintiff believed "that her developmental history is within normal limits, but she reported that she always had trouble concentrating and understanding verbal and written academic information."  (Tr. 421).   Dr. Hamidian also observed that:

> [Plaintiff] has had an extensive mental health history from young adulthood. She has had two inpatient hositalizations due to mental health issues. She has been in treatment with Dr. Chandragiri and Antoinette Hamidian, Psy.D since 2008 for bipolar disorder symptoms. She has been tried on numerous courses of psychotropic

> medications such as Lithium, Paxi!, Zoloft and Adderall with poor
> results.  She is currently [sic] prescribed Lamotrigine 150 mg. 2 x day;
> Clonazepam 0.5 mg 3 x day; Sertraline 100 mg 2 @bedtime; Geodon
> 80 mg 2 x day; Buspirone 10 mg 2 in the evening and 2 @bedtime;
> Simvastatin 40 mg 1 per day which have been helpful in reducing
> paranoid thinking and increasing clarity of thought and keeping her
> out of the hospital.

(Tr. 421).

During the evaluation, Plaintiff's facial expression was appropriate with good eye contact and she was oriented "x 3." (Tr. 421).  Dr. Hamidian found Plaintiff to be cooperative and have a calm mood.  (Tr. 421).  Dr. Hamidian opined that Plaintiff's memory was "clearly impaired," noting that Plaintiff had "a difficult time providing a medical, psychiatric, and personal history. . . . Dates and times, along with facts and a continum [sic] of events is impaired." (Tr. 421).  She had below average cognitive skills.  (Tr. 421).  Dr. Hamidian assigned her a GAF score of 55.  (Tr. 422).  Dr. Hamidian concluded that Plaintiff could not live independently.  (Tr. 422).  She further stated that Plaintiff would be homeless without her husband's support.  (Tr. 422).  She described Plaintiff as a candidate for a partial hospitalization program.  (Tr. 422).

### 4.  Thomas P. Smith, Psy.D., Consultative Examination

On October 29, 2010, Dr. Smith examined Plaintiff.  (Tr. 360-66).  For employment history Plaintiff reported that her first job was at the age of 19 doing the factory work for approximately two years, then as a dancer for approximately eight years, followed by approximately one year of more factory work where she hurt her back and then did factory work for approximately one more year.  (Tr. 363).

During the October 2010 examination, Plaintiff reported experiencing anxiety and paranoia.  (Tr. 360-61).  She reported her in-patient treatment at CMC and the Horsham Clinic, and that "she [had] been in and out of psychiatric hospitals since her teen years."  (Tr. 361).  Regarding her daily activities, Plaintiff stated that she prepared breakfast, readied her son for school, cleaned the house, possibly napped, watched television, and waited for her son to come home to care for him.  (Tr. 363).  According to Plaintiff, her husband handled the remainder of the household chores and set out her medications.  (Tr. 363).

Dr. Smith observed that Plaintiff was alert and oriented and had a below average fund of knowledge and vocabulary.  (Tr. 363).  Dr. Smith noted that

Plaintiff had a depressed/variable mood and a labile affect with her mood and affect appearing normal and appropriate. (Tr. 363-64). Plaintiff had difficulty with long-term memory, but her short-term memory remained intact. (Tr. 364). She reported difficulty concentrating and her cognitive processes remained normal. (Tr. 364). Plaintiff retained fair insight, judgment, and impulse control. (Tr. 364). She complained of episodic periods of suicidal or homicidal ideation, but denied any current suicidal or homicidal ideas, plans, or intent. (Tr. 364).

Smith opined that, Plaintiff had difficulty in social engagements, following instructions, dealing with change, and engaging socially in public or in a work setting. (Tr. 365). He assigned her a GAF score of 55 to 60. (Tr. 365). In a November 8, 2010, Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Smith opined that Plaintiff had slight and/or moderate limitations in her abilities to understand, remember, and carry out instructions; and to respond appropriately to supervisors, co-workers, and work pressures. (Tr. 357-59).

### 5. Anthony Galdieri, Ph.D. State Agency Psychologist

On November 15, 2010, Dr. Galdieri completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment. (Tr. 367-83). Dr. Galdieri determined that Plaintiff had mild restrictions to her activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and one or two episodes of decompensation. (Tr. 377).

Dr. Galdieri noted that Dr. Hamidian's September 10, 2010, opinion "relied heavily on the subjective report of symptoms and limitations provided by [Plaintiff]. However, the totality of the evidence does not support [Plaintiff's] subjective complaints. (Tr. 382-383). Dr. Galdieri stated that the opinion of Dr. Hamidian "contrast[ed] sharply with other evidence in the record, which render[ed] it less persuasive." (Tr. 383). Dr. Galdieri concluded that Plaintiff's limitations did not preclude her from meeting the basic mental health demands of competitive work on a sustained basis. (Tr. 383).

### 6. Dr. Lyons, Treating Physician

Generally, Dr. Lyons' reports demonstrate unremarkable psychiatric observations. On March 18, 2011; July 19, 2011; August 11, 2011; and,

November 8, 2011, Dr. Lyons observed Plaintiff to be alert and oriented, with a normal mood and affect, and that her psychiatric medications seemed to be working "very well." (Tr. 427-32).

### 7.  Mary Ryczak, M.D., State Agency Physician

On October 8, 2010, Dr. Ryczak reviewed Plaintiff's records and found her able to perform light work. (Tr. 351-54). In support of her findings, Dr. Ryczak reviewed Plaintiff's medical history, her activities of daily living, the type of treatment she received, and her response to treatment. (Tr. 355). Dr. Ryczak noted that Plaintiff reported no physical problems on page six of her "Activities of Daily Living" report, that the record reflects significant gaps in Plaintiff's treatment history, and Plaintiff had not been prescribed narcotic medication for back pain. (Tr. 355). Dr. Ryczak concluded that based on the evidence of record, Plaintiff's statements were "partially credible." (Tr. 355).

### 8.  Casey J. Burke, D.O.

On September 20, 2011, Plaintiff sought treatment with Dr. Burke for left hand pain that radiated up to her shoulder. (Tr. 416-18). Plaintiff reported that she was right-handed. (Tr. 416). Upon examination, Plaintiff had a positive Phalen's

test in her left arm. (Tr. 417). She also had a positive Phalen's test in her right arm, but it was less significant. (Tr. 417). Dr. Burke observed that Plaintiff's left elbow, wrist, hand, and fingers were normal to inspection and palpation, and to have full range of motion. (Tr. 417). Plaintiff's left elbow, wrist, and hand also had full strength. (Tr. 417). Dr. Burke administered an injection into Plaintiff's left wrist. (Tr. 417).

During an examination dated October 11, 2011, Dr. Burke noted that Plaintiff's left hand symptoms had come on gradually and had been present for "several months" and was, at the time of the exam, "moderate in severity." (Tr. 413). Plaintiff reported that the injections provided no relief. (Tr. 413). Dr. Burke observed that: Plaintiff had full strength and range of motion in her left elbow and wrists; full range of motion for the fingers on her left hand; median nerve compression test was negative on the left; no clunking or pain noted on circumduction maneuvering on the left; CMC grind test was negative at the left CMC joint; Finkelstein's test was negative on the left; Phalen's test was negative on the left; no pain upon resisted thumb palmar abduction on the left; finger extension test was negative on the left; and scaphoid shift test was negative on the

left.  (Tr. 414).  On August 11, 2011, Plaintiff reported left wrist pain due to blocking her son's punches with her wrist.  (Tr. 429).  According to Dr. Burke Plaintiff experienced "intense pain over the area of the anatomic snuffbox," has a decreased range of motion of the wrist, and had been using a brace.  (Tr. 429).

### 9.  Lay Statement from Anthony Marconi, Plaintiff's Husband

Mr. Marconi testified that he refilled and maintained Plaintiff's medications because she had poor memory.  (Tr. 62-63).  He also called her in the morning and sometimes in the evening to ensure that she took her medications.  (Tr. 63).  In addition, he called her a dozen times per day to check in on her.  (Tr. 63).  Plaintiff's husband also testified that he set out a daily list of chores for Plaintiff to do, otherwise, "[s]he'd sit in front of the TV all day long like a zombie."  (Tr. 68).

Mr. Marconi laid out these tasks step-by-step because otherwise, Plaintiff would forget how to perform them.  (Tr. 63).  Plaintiff's husband also stated that he assisted Plaintiff with household chores.  (Tr. 65-66).  Mr. Marconi also testified that when Plaintiff was on Lithium, she would experience hallucinations, seeing people in their house that were not there.  (Tr. 67).

## 10. Plaintiff's Testimony

Plaintiff testified that only her back and mental health issues disabled her. (Tr. 47).  Plaintiff asserted that her back impairment prevented her from standing or doing any activity for a long period.  (Tr. 39).  Plaintiff stated that at her last job as a janitor, she experienced paranoia and visual hallucinations of faceless people. (Tr. 40).  She also hid in the linen closet.  (Tr. 40, 50).  Ultimately, Plaintiff quit her job and sought inpatient treatment for these symptoms.   (Tr. 41).   She acknowledged that she no longer experienced visual hallucinations.  (Tr. 41-42).

Regarding her daily activities, Plaintiff testified that she maintained a driver's license that she used to drive to doctors' offices and stores.  (Tr. 30-31). She did not like going out (Tr. 38), but had one good friend who she saw every other week (Tr. 37).   Plaintiff sometimes drove 20-25 minutes to her friend's house.   (Tr. 37).   She also ate out at one restaurant that did not have many customers.  (Tr. 38).

At home, Plaintiff cared for her autistic, eight-year-old son.  (Tr. 33-34, 42-44).  In addition to helping her son dress (Tr. 34, 42), Plaintiff made him breakfast (Tr. 33), assisted him with personal-care tasks (Tr. 43), and watched him all of the

time (Tr. 44).  Plaintiff sometimes drove him to counseling and participated in the sessions.  (Tr. 46).  When not caring for her son, Plaintiff washed dishes and laundered clothes.  (Tr. 34).  Plaintiff also cut coupons.  (Tr. 44).  Plaintiff mowed the lawn with a riding lawnmower.  (Tr. 35).  She also fed her animals and took her dog to the veterinarian.  (Tr. 36).

She testified that the last job that she worked at was as a janitor.  (Tr. 31).  At this job, she suffered from paranoia and hallucinations, and would oftentimes hide at work in closets.  (Tr. 40).  The Plaintiff indicated that she left because she was experiencing hallucinations.  (Tr. 40)  After she quit her job, she wandered aimlessly for hours, and eventually sought inpatient treatment at Community Medical Center after she expressed a desire to kill her son and herself.  (Tr. 40, 49-51).  Plaintiff testified that she was enrolled in special education classes while in school and testified that she does not read much.  (Tr. 48).  When she did read, she liked to read fiction by Stephen King.  (Tr. 49).  The Plaintiff testified that she sleeps a lot throughout the course of a typical day due to her psychological problems and the side effects of her medications.  (Tr. 56).

### III.     Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits.  20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428.  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed.  20 C.F.R. § 404.1520(a)(4).  The Commissioner must sequentially determine: (1) whether the

claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.   20 C.F.R. §§ 404.1520, 416.920.   Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").   20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.   The claimant bears the burden of proof at steps one through four.   *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).   If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.   *Id.*   The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.   *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those

findings are supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance. *Jones*, 364 F.3d at 503. If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

### A. ALJ's Claim Approval Rate

The "Plaintiff avers that ALJ [Jonathan] Blucher has only approved nine

percent (9%) of the disability claims that were assigned to him this year. The Plaintiff avers that ALJ Blucher may have the lowest claim approval rate of any ALJ in the entire United States."  Pl. brief at 1.  It is unclear whether Plaintiff is presenting an argument.

The Court reminds Plaintiff that Local Rule 83.40.4(b) requires that in social security cases, a Plaintiff's brief "shall set forth . . . the specific errors committed at the administrative level which entitle plaintiff to relief."  M.D. Pa. Local Rule 83.40.1.  Local Rule 83.40.4(b) elaborates that "[a] general argument that the findings of the administrative law judge are not supported by substantial evidence is not sufficient."  *Id.*; *cf. Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008) (explaining that Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a 'showing,' rather than a blanket assertion, of entitlement to relief and, as a threshold requirement, the plain statement of pleadings must possess enough heft to show that the pleader is entitled to relief).  Failure to adequately raise an issue results in its waiver.  *See Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.*, 44 F.3d 1194, 1203–04 (3d Cir.1995) (upholding a district court's finding that a party had waived an issue when a party only made vague references to the issue).

Notwithstanding Plaintiff's cursory treatment of the issue, the Court is persuaded by other jurisdictions that have held that an ALJ having a low rate of claim approval, by itself, is an insufficient reason to warrant a remand.[4]

### B. Weight Accorded Medical Opinions

Plaintiff argues that the ALJ erred by "subordinating the opinions of the Plaintiff's treating psychologist, Dr. Antoinette Hamidian, to that of a Consultative Examiner who conducted a brief examination of the Plaintiff over three (3) years ago and only reviewed a partial psychological file?" Pl brief at 4-5, 8-10, 12.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's

---

[4] *See e.g.*, *Perkins v. Astrue*, 648 F.3d 892, 903 (8th Cir. 2011) (concluding that where the national average remand rate is forty-seven percent, a one percent discrepancy is insufficient to demonstrate an administrative law judge's bias); *Johnson v. Comm'r of Soc. Sec.,* No. 08–4901, 2009 WL 4666933, at *4 (D.N.J. Dec. 3, 2009) (noting that an ALJ's impartiality should not be judged by statistics of how that judge has previously ruled); *Doan v. Astrue*, No. 04CV2039 DMS (RBB), 2010 WL 1031591, at *14-15 (S.D. Cal. Mar. 19, 2010) *aff'd in part, rev'd in part sub nom. Phuong Doan v. Astrue*, 464 F. App'x 643 (9th Cir. 2011) (finding statistical evidence that ALJ had high rate of denial during a particular time period was insufficient to establish bias without other evidence such as the ALJ's routine misapplication of the law, problematic credibility determinations, or disparate treatment towards different protected classes); *Smith v. Astrue,* No. H–07–2229, 2008 WL 4200694, at *5-6 (S.D. Tex. Sept. 9, 2008) (finding that an ALJ's approval rate of only 7.19 percent was troubling, but insufficient, in and of itself, to show bias).

condition over a prolonged period of time.'"  *Morales v. Apfel*, 225 F.3d 310, 317

(3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429).   The applicable

Social Security regulations instruct that:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations. . . .

20 C.F.R. § 404.1527(c)(2); *see also Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d

Cir. 2001).   If a treating source's opinion as to the nature and severity of a

claimant's impairments is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the] case record," it will be given "controlling weight."  20 C.F.R. §

404.1527(c)(2); *see also* SSR 96–2p.   After undertaking this analysis, if an ALJ

determines that a treating physician's opinion is not entitled to controlling weight,

he or she must then determine what weight to give the opinion.   The ALJ must do

so by considering the following factors: length of the treatment relationship and

frequency of examination, nature and extent of the treatment relationship, the

degree to which the physician presents relevant medical evidence in support of the opinion, the consistency of the opinion with the record as a whole, the degree to which the opinion relates to an area in which the physician specializes, and any other factors "which tend to support or contradict the opinion."   20 C.F.R. § 404.1527(c)(2).

Where a treating source's opinion conflicts with that of a non-examining source, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317.  An ALJ may reject a treating physician's opinion as long as the rejection is due to contradictory medical evidence, rather than the ALJ's "own credibility judgments, speculation, or lay opinion."   *Morales v. Apfel*, 225 F.3d 310, 317 (citation omitted).

In this case, the ALJ discussed the opinions of Plaintiff's treating licensed psychologist Dr. Hamidian and concluded that they were not entitled to significant weight because they were contradicted by Plaintiff's report of capabilities, contemporaneous treatment notes, and Dr. Galdieri's opinion, which agreed with the assessment and conclusions of Dr. Smith.  (Tr. 18).  The ALJ was careful to

point out inconsistencies in Plaintiff's report of medical history and symptoms. For example, the ALJ observed the minimal medical record indicating the possibility that Plaintiff "disassociates," and that although Plaintiff testified to hallucinating for two months immediately preceding her July 2010 hospitalization, "she specifically denied auditory or visual hallucinations, and had no delusional ideation." (Tr. 19). The ALJ also noted that Plaintiff like to read Stephen King books, noted medical records that stated her concentration was good, and conflicting evidence where Plaintiff reports she did not take special education classes, only later to state that she was in special education. (Tr. 16).

Dr. Galdieri noted that Dr. Hamidian's September 10, 2010, opinion "relied heavily on the subjective report of symptoms and limitations provided by [Plaintiff]. However, the totality of the evidence does not support [Plaintiff's] subjective complaints." (Tr. 382-383). Dr. Galdieri further opined that the opinion of Dr. Hamidian "contrast[ed] sharply with other evidence in the record, which render[ed] it less persuasive." (Tr. 383). Given the inconsistencies that the ALJ noted with Plaintiff's report of capabilities, symptoms, and events; it is reasonable that the ALJ gave more weight to the opinion of Dr. Galdieri who opined that Dr.

Hamidian's opinion relied too heavily on Plaintiff's subjective complaints, rendering her opinion inconsistent with the totality of the evidence.  Moreover, Dr. Galdieri agreed with and incorporated the detailed opinion of Dr. Smith which also extensively detailed Plaintiff's psychiatric history including the most severe symptoms exhibited during the deterioration leading up to Plaintiff's inpatient treatment.

As Plaintiff points out, Dr. Galdieri's November 2010 opinion was nearly a year before the ALJ's January 2012 decision and did not account for Dr. Hamidian's second opinion rendered on November 29, 2011.  As the Third Circuit has observed:

> Second, because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where "additional medical evidence is received that *in the opinion of the [ALJ]* . . . may change the State agency medical ... consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing," is an update to the report required. SSR 96–6p (July 2, 1996) (emphasis added).

*Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).   In this instance, is was reasonable for the ALJ to determine that updated medical source

opinions were required. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361. The Court notes that Dr. Galdieri's November 2010 opinion did account for Dr. Hamidian's September 2010 opinion and accounted for the most severe of Plaintiff's symptoms leading up to her inpatient treatment, yet still opined that Plaintiff was able to work. Plaintiff does not direct the Court to specific limitations or symptoms in the subsequent treating history that would negate the import of Dr. Galdieri's findings, especially the conclusion that opinions too reliant on Plaintiff's subjective reports should get little weight given Plaintiff's inconsistent reports throughout the record. Plaintiff does not explain what probative evidence produced after Dr. Galdieri's November 2010 report demonstrates that Plaintiff experienced an increased severity of symptoms.

The ALJ extensively addressed the medical record after Dr. Galdieri's November 2010 opinion. The most significant differences in Dr. Hamidian's November 2011 opinion that was not available at the time of Dr. Galdieri's opinion, was Dr. Hamidian's conclusion that Plaintiff would be homeless without her husband's support and would be a candidate for a partial hospitalization

program.   The ALJ addressed the internal inconsistency within Dr. Hamidian's

November 2011 opinion stating that:

> [Dr. Hamidian] gives a GAF score of 55 indicating moderate
> symptoms, yet concludes the claimant is "unable to live
> independently" and is a "candidate for a partial hospitalization
> program." This is quite contrary to [Plaintiff's] own testimony about
> her activities of daily living and ability to care for an autistic child.

(Tr. 18) (internal citations omitted).  The ALJ did not err in according little weight

to the opinions of Dr. Hamidian and supported his findings with careful

explanations regarding inconsistencies in the record, as well as with medical

opinion.   Substantial evidence supports the ALJ's allocation of weight to the

medical source opinions.

### C. Credibility Determinations of Lay Statements

Plaintiff contends that the ALJ erred by "rejecting all of Mr. Marconi's

testimony on the basis that he is the Plaintiff's husband."  Pl. Brief at 13.  Plaintiff

further stated that "[f]or this rationale to be accepted, then no spouse could ever

offer credible testimony in support of a spouse's claim."  Pl. Brief at 13.  Plaintiff

also states, "ALJ Blucher inexplicably rejected the testimony of [Plaintiff's]

husband Anthony Marconi," (Pl. Brief at 4) and that the ALJ "rejected all of Mr.

Marconi's testimony essentially finding that since he is married to the Plaintiff, none of his testimony could be classified as credible!" Pl. Brief at 5.

Observations of a plaintiff made in third party lay statements are valid sources for an ALJ to consider.  *E.g.*, 20 C.F.R. § 404.1513(e)(2); SSR 96-7p; *see e.g.*, SSR 13-2p (question 6(b), question 8(c)(ii)) (discussing the relevance of "'other' non-medical" sources such as family and friends).[5]  Social Security Ruling 96-7p, states that:

> Other sources may provide information from which inferences and conclusions may be drawn about the credibility of the individual's statements. Such sources may provide information about the seven factors listed in the regulations and may be especially helpful in establishing a longitudinal record. Examples of such sources include . . . nonmedical sources such as family and friends.

SSR 96-7p.  The unsubstantiated disregard of such third party statements amounts to error.  *See* 20 C.F.R. § 404.1513(e)(2); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987); *Escardille v. Barnhart*, No. CIV.A. 02-2930, 2003 WL 21499999, at *7-8 (E.D. Pa. June 24,

---

[5] Social Security Rulings become effective upon publication, and the effective date of SSR 13-2p is March 22, 2013.  Although SSR 13-2p (which superseded SSR 82-60) was not binding on the ALJ at the time the original administrative decision issued on November 3, 2011, given that the case will be remanded on other grounds, the Court finds the ruling instructive.

2003). As the Ninth Circuit observed, "[d]isregard of [third party lay statements] violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing 20 C.F.R. § 404.1513(e)(2)) (finding that testimony from a plaintiff's daughter to be fully competent to substantiate doctor's diagnosis of a plaintiff's depression).

It is error for an ALJ to presume bias or lack of credibility solely based on familial relationship. *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999) ("When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'"); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987); *Escardille v. Barnhart*, No. CIV.A. 02-2930, 2003 WL 21499999, at *7-8 (E.D. Pa. June 24, 2003) (finding ALJ erred in implying without any factual foundation that the siblings' testimony was motivated by financial gain); *Cowart v. Comm'r of Soc. Sec.*, No. CIV.A. 08-14887, 2010 WL 1257343, at *8 (E.D. Mich. Mar. 30, 2010) (finding that ALJ erred in imputing bias or lack of credibility to testimony of a plaintiff's mother solely based on familial relationship); *Traister v. Astrue*, No. EDCV 09-01082-SS,

2010 WL 1462118, at *4 (C.D. Cal. Apr. 13, 2010) (finding that "although a relationship with the plaintiff can be one possible ground to question credibility, something more is required to show that a lay witness' testimony is so tainted by bias that it must be rejected").  As, the Ninth Circuit also observed, "the fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony.  To the contrary, testimony from lay witnesses who see the claimant every day is of particular value . . . ."  *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996).

The Court finds Plaintiff's argument is meritless.  Plaintiff does not direct the Court to where in the decision the ALJ indicated that the testimony of Mr. Marconi's was disregarded due to his relationship with Plaintiff.  Contrary to Plaintiff's assertion that Mr. Marconi's testimony was "inexplicably" rejected, the ALJ stated:

> [Plaintiff's] husband testified and his testimony was quite contrary to [Plaintiff's] as he indicated that she is practically not able to function without his daily assistance. When comparing the claimant's testimony to what she told her doctors, I find the claimant's testimony regarding her activities of daily living more believable than her husband's testimony.

(Tr. 16).  The ALJ acted within his power to find Mr. Marconi's testimony to be less credible.  *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

### D. Failure of Hypothetical to Account for Plaintiff's Impairments

Plaintiff argues that "the ALJ's hypothetical question to the vocational expert failed to set forth any restrictions or impairments related to the Plaintiff's carpal tunnel syndrome."  Pl. Brief at 13.  Plaintiff continues that "[t]he ALJ's hypothetical questions to the vocational expert erroneously indicated that the Plaintiff was capable of using her upper extremities without restriction."  Pl. Brief at 13.  In the January 2012 decision, the ALJ stated:

> There are notes indicating [Plaintiff] complained of left hand pain in September 2011.  She had a positive Phalen's test on the left and on the right, but the right was not as significant. She had an injection for left carpal tunnel syndrome. There is no indication that this is an impairment that is expected to last 12 months or more.

(Tr. 21) (internal citations omitted).  The ALJ also noted that Plaintiff did not mention any problems with her hands during the hearing.  (Tr. 15).  During the October 2011 examination, Dr. Burke noted that Plaintiff's symptoms had come on gradually and had been present for "several months" and was at the time of the exam "moderate in severity."  (Tr. 413).  Dr. Burke observed that Plaintiff had full

strength and range of motion in her left elbow and wrists, and full range of motion for the fingers on her left hand.  (Tr. 414).

At the administrative hearing, The VE identified the light occupations of silver wrapper and assembler of small products (Tr. 73-74), and the sedentary occupation of a lens inserter (Tr. 74).  Among other things, the VE testified that these occupations required no more than frequent (i.e., up to 66% of the workday) use of the upper extremities.  (Tr. 77).

The Third Circuit has explained that "objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself."  *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005).  Where a plaintiff contends that the VE "testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert," such are challenges to the RFC assessment itself.  *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005).

In order for a vocational expert's answer to a hypothetical to be considered substantial evidence, the question must reflect "*all* of the claimant's impairments

that are supported by the record." *Allen v. Barnhart*, 417 F.3d 396, 407 (3d Cir. 2005) (emphasis in original). Additionally, "'great specificity' is required when an ALJ incorporates a claimant's mental or physical limitations into a hypothetical." *Ramirez v. Barnhart*, 372 F.3d 546, 554-55 (3d Cir. 2004) (internal citations omitted); *see also* SSR 96–8p (requiring a "more detailed assessment" of the claimant's mental limitations at step five of the disability analysis).

In this instance, Plaintiff's objection to the VE hypothetical is an attack on the RFC. The Court finds that substantial evidence supports the ALJ's decision to omit any hand limitation, as the record demonstrated that Plaintiff possessed full range of motion for the left wrist and hand, the record does not demonstrate any limitations in her abilities regarding her upper extremities, and the record supports the ALJ's determination that any alleged limitation of the upper extremities did not meet the twelve-month durational requirement. The ALJ did not err in electing not to incorporate any upper extremity limitation in the hypothetical to the VE.

## IV. Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence.  42 U.S.C. §§ 405(g), 1382c; *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. *Monsour Med. Ctr.*, 806 F.2d at 1190. Here, a reasonable mind might accept the relevant evidence as adequate. Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.


Dated: March 27, 2015                              _____s/Gerald B. Cohn_____
                                                   GERALD B. COHN
                                                   UNITED STATES MAGISTRATE JUDGE